# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
DANIEL REALE and                :
MIRIAM IRIZARRY,                :
                                :
          Plaintiffs,           :
v.                              :
                                :
CHRISTI HASKELL; SCOTT SUGARMAN; :
PLAINFIELD BOARD OF EDUCATION;  :   Civil No. 3:21-cv-1349 (AWT)
KATHLEEN BARRY; ROXANNE BOISSEE; :
PEGGY BOUREY; MICHAEL BROUGHTON; :
ARRIANA LANDRY; HEATHER SMITH;  :
AUDREY LEMIEUX; DIANE SUMMA;    :
and PAUL BRENTON,               :
                                :
          Defendants.           :
------------------------------ x
```

## <u>RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

The defendants have moved for summary judgment on the remaining claims in the Amended Complaint: Daniel Reale's claim under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et seq.</u> ("ADA") against Christi Haskell, Scott Sugarman, and the Plainfield Board of Education (the "Board") (Count One); Reale's First Amendment claim against the same defendants (Count Two); and Miriam Irizarry's First Amendment claim against Sugarman and the Board (Count Three). Haskell has been the Chair of the Board since 2017, and Sugarman has been the Assistant Superintendent since 2019. The defendants move for summary judgment on all these counts. For the reasons set forth below, the motion is being granted.

I.    **FACTUAL BACKGROUND**

During the COVID-19 pandemic, the Board issued a facemask policy that applied to in-person attendance at Board meetings. Reale's claims in Count One and Count Two arise out of enforcement of that policy against him at a Board meeting on September 8, 2021. Irizarry's claim in Count Three arises out of a September 1, 2021 protest, outside the Plainfield Central Middle School (the "Middle School"), in which she participated.

A.    **Reale**

1.    **The Governor's Executive Orders**

In 2021, the Governor of Connecticut, Ned Lamont, issued a series of executive orders relating to the COVID-19 pandemic. Executive Order 13A, issued on August 5, 2021, contained the following language:

> A person while indoors in a public place who does not maintain a safe social distance of approximately six feet from every other person and who is not fully vaccinated for COVID-19 shall cover their mouth and nose with a mask or cloth face covering. A person shall be considered fully vaccinated 14 days after receiving the final recommended dose of a vaccine approved for use against COVID-19 by U.S. Food and Drug Administration, or as otherwise defined by the Centers for Disease Control.
>
> a. Nothing in this order shall require the use of a mask or cloth face covering by anyone for whom doing so would be contrary to his or her health or safety because of a medical condition, behavioral condition, or disability, or anyone under the age of 2 years. Any person who declines to wear a mask or face covering because of a medical condition, behavioral condition, or disability shall be exempt from this order and any

requirement to wear masks or face coverings
promulgated in or pursuant to any COVID-19 Order, but
only if such person provides written documentation
that the person is qualified for the exemption from a
licensed or certified medical provider, psychologist,
marriage and family therapist, professional counselor,
social worker, or behavior analyst, the Department of
Developmental Services or other state agency that
provides or supports services for people with
emotional, intellectual or physical disabilities, or a
person authorized by any such agency. Such
documentation shall not be required to name or
describe the condition that qualifies the person for
the exemption.

     b. The Commissioner of Public Health shall issue
a rule setting forth a comprehensive list of
facilities, venues, and other locations where masks
and cloth face coverings are required, including for
people who are vaccinated, and will amend said rule as
the Commissioner determines is warranted by public
health conditions. . . .

     . . . .

     e. Any business, nonprofit organization, property
owner, or state, regional, or municipal government or
agency may, subject to the exceptions in subsection
(a) of this order . . . require the universal use of
masks or face coverings or require staff to wear masks
or face coverings in settings under their ownership or
control, including, but not limited to, offices,
places of public accommodation, public venues, or
public meetings.

Defs.' Local Rule 56(a)(1) Statement of Facts in Supp. of Summ.

J. (ECF No. 167-2) ("DSF") Ex. 8 (ECF No. 167-10), at 4-6.[1]

     Pursuant to paragraph b, on August 7, 2021, the State of

Connecticut Department of Public Health issued a rule stating

---

[1] The page numbers cited to in this ruling for documents that have been
electronically filed refer to the page numbers in the header of the documents
and not to the page numbers in the original documents, if any.

that "all individuals, regardless of vaccination status, shall wear a face-covering mask at all times when . . . [i]nside PreK-12 public or non-public . . . school buildings, excluding residential dormitories, when students are present," but there is "no need to wear a mask when in a school building on a weekend or after hours when students are not present inside the building . . . ." Defs.' Supp. Local Rule 56(a)(1) Statement of Undisputed Material Facts (ECF No. 183-1) ("Defs.' Supp.") Ex. 18 (ECF No. 183-2), at 1.

### 2. The Board's Facemask Policy

At the time of the events at issue, the Board held in-person public meetings in a public venue, the Plainfield High School auditorium. The Board adopted a policy that required in-person attendees to wear a facemask. The policy was published on the Board's website and was attached to each meeting agenda. The policy stated that there was a facemask requirement

> as outlined in Executive Order 13a [i]nside PreK-12 public or non-public (e.g., "private", "independent", "boarding", etc.) school buildings, excluding residential dormitories, when students are present. As students are present during all BOE meetings, masks are required for all visitors. Individuals who are unable to wear a mask in the building as outlined by the executive order, shall be provided the ability to view the meeting remotely and shall be accommodated in accordance with Order 7b.

DSF Ex. 1 (ECF No. 167-3), at 7 (Ex. A). This requirement was in effect until March 2022, after the events at issue here.

In accordance with its facemask policy, the Board's meetings were streamed online and there was an option for remote participation. Instructions for remote participation were published on the Board's website. Those instructions provided:

> Plainfield Public Schools provides access to public Board of Education meetings virtually through Zoom teleconference.
>
> At designated meetings members of the public can address the Board in real time by submitting a Public Speaker request to tammy@plainfieldschools.org by 12:00 noon the day of the meeting. Comments will be both live and virtual, but all speakers must sign up via the form. . . .
>
> . . . .
>
> Members of the public may also submit public comments via the following email address: questions@plainfieldschools.org . . . . Members of the public are encouraged to send their thoughts and opinions to the Board at any time, but only those received during the public comment submission window will be included in the public record of a Board of Education meeting.
>
> Please note that [p]er BOE policy 9323.1, there will be no dialogue between Board members and the Public at Board meetings except to clarify the nature of questions or comments.
>
> Under the direction of the Board Chair, members of the Board and the administration may respond to comments. However, in consideration of those in attendance and in an effort to proceed in a timely manner, follow-up discussion may need to take place outside of the meeting setting.

DSF Ex. 1, at 7 (Ex. A). Online participants were not required to give any justification for their remote attendance and were not required to wear a facemask. Reale knew that he could attend

remotely in this manner; he simply thought that "based on the illegal executive orders, they had no right to preclude me from being there in person." DSF Ex. 11 (Reale Depo.) (ECF No. 168-1), at 53:24–54:1.

### 3.    The September 8, 2021 Board Meeting

On September 8, 2021, both Executive Order 13A and the Board's facemask policy were in effect. Students were present in the auditorium for the entire duration of the September 8, 2021 Board meeting. Two student representatives sat on the stage with the Board. See Defs.' Supp. Ex. 19 (Supp. Haskell Aff.) (ECF No. 183-3) ¶ 10 ("Board of Education Student Representatives were present for the entire duration of the September 8, 2021 Board of Education meeting."); Defs.' Supp. ¶ 66 (authenticated video)[2] ("BOE Video"), at 21:27–23:43 (showing two of the three student representatives introducing themselves while in their Board seats onstage).

That evening, Reale attended a Board meeting "in-person and without a mask." DSF ¶ 36; see BOE Video, at 44:00–45:12. "Prior to the start of the meeting, [Sugarman] encountered two individuals who were not wearing masks while inside of the school building. One of those individuals was Daniel Reale." DSF

---

[2] Reale asserts "the audio and video did not adequately and completely capture the entirety of the interactions among the Parties. In fact, I was unable to hear all the interactions in this video. . . . This requires a trial." Reale Supp. Aff. (ECF No. 194-2) ¶ 3. Although Reale was not on camera, the audio is clear, and there is no genuine issue as to what was said.

Ex. 2 (Sugarman Aff.) (ECF No. 167-4) ¶ 36. "[Sugarman] asked both individuals to wear a mask and, after some discussion, one of the two individuals put on a mask, but Mr. Reale continued to refuse to wear a mask." Id. ¶ 37. When it was Reale's turn to speak during the time for public comment, defendant Haskell asked him to put on a mask before he gave his remarks. See BOE Video, at 44:35-45:12. Haskell avers that "[she] did not know what topic Mr. Reale intended addressing with the BOE during public comment." DSF Ex. 1 (Haskell Aff.) (ECF No. 167-3) ¶ 18. Reale stated that he was exempt because he had a medical exemption, but he provided no documentation as required by Executive Order 13A. See BOE Video, at 44:35-45:12. Multiple people asked Reale to put on a facemask, and he again stated that he had an exemption. See BOE Video, at 44:00-45:12. When Reale was asked, "Do you have some paperwork that suggests you're exempt from the state law?", he responded, "Plenty of medical records, don't have them on me, don't need to have them on me, you can't ask, that's a Tier IV HIPAA violation." BOE Video, at 44:45-44:55. Reale offered to address the Board from the back of the room, but the Board declined his offer because that would have been in violation of the Executive Order. Ultimately, Reale was asked to leave the building by the Board

because he refused to wear a mask.[3] See BOE Video, at 44:53-45:12.

While Haskell avers that she did not become aware that Reale was not wearing a mask until it was his turn to speak, Reale disputes this. He avers that "I was directly in front of where the Board of Education sat . . . and was plainly not wearing a mask at any time, in direct view of Defendant Haskell. I was also wearing a suit and very plainly stood out." Reale Aff. (ECF No. 177-1) ¶ 12. However, Sugarman avers that "[he] asked Mr. Reale to sit near the back away from other people," DSF Ex. 2 ¶ 40, and that "Reale moved his seat to the back of the auditorium as requested," id. ¶ 41. In any event, Reale provides no evidentiary support for his contention that Haskell saw him before it was his turn to speak; he only avers that he was sitting where she could have seen him.

### 4.   Reale's Claimed Disability

Reale testified that, "from basically childhood," he has suffered from chronic rhinosinusitis and associated allergies, which can "result in asthma." DSF Ex. 11, at 47:11-12, 51:14-16. Breathing in allergens, such as pollen, mold, and dust, through

---

[3] Reale denies paragraph 45 of the defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts (ECF No. 167-2, at 9) but cites only to documents that are inadmissible hearsay, namely freedom of information requests written by him. Reale's contention that the documents are business records of Attorney Bona's office lacks merit because they do not satisfy the requirements of Federal Rule of Evidence 803(6) because, among other things, making them was not a regular practice of Attorney Bona's law office.

his nose and mouth exacerbates his condition. While at home, Reale minimizes the impact of this condition by reducing the amount of pollen, mold, and dust in his house. The last time that Reale saw an allergist for what he calls his chronic rhinosinusitis was in 2011. No doctor has ever recommended surgery to treat it.

There are no medical records showing that a doctor has ever diagnosed Reale as having chronic rhinosinusitis. Reale has provided medical records for treatment he received on February 14, 2018, August 31, 2019, January 6, 2020, and July 7, 2020. On two of those occasions his chief complaint included sinus and chest congestion; on two occasions it did not. On one occasion the duration was listed as two weeks on-and-off; on the other occasion it was listed as one week. On all four occasions his physical exam showed that his respiratory functions were normal. On the two occasions when he was not complaining about sinus or chest congestion, an examination showed that his ears, nose, and throat were normal. He was prescribed Augmentin and Prednisone for issues relating to his sinuses and chest.

Reale avers that a now-deceased allergist who saw him in 2011 "diagnosed his condition" and determined that Reale's sinus cavities were smaller than normal, Reale Aff. ¶ 6, but the "medical record has been purged" due to its age, DSF Ex. 12 (Reale Depo.) (ECF No. 168-2), at 39:18-19.

When asked whether he has asthma, Reale testified that "I have remediated a lot of my asthma . . . ." DSF Ex. 11, at 51:14-16. When asked whether he uses an inhaler, Reale testified that "I used to have an inhaler, although what had happened -- that was more true when I was 90 pounds heavier than I am now." Id. at 51:8-20. When asked when he last used an inhaler, Reale responded, "I wanna say 2018." Id. at 51:21-22. That inhaler was not one for which a prescription was required. Rather it was an over-the-counter Primatene Mist. The parties disagree about whether Reale ever had an inhaler for which a prescription was required, but Reale does not dispute that the last time he used an inhaler was in 2018 and that it was an over-the-counter product.

Reale testified that he cannot wear a facemask because "[i]t gets really uncomfortable really quickly. I heat up and it kind of [i]s just--it's like recycling my own air to the point where it's like the mask just has to come off." DSF Ex. 11, at 49:12-15. He also testified that a "face shield kind of has the same effect. I mean, it can't stay on for more than like 10 minutes," or else "[i]t just gets really uncomfortable and hard to breathe." Id. at 49:18-20, 23-24.

Reale testified that in or around May 2020 he wore an N95 mask during a "one-man protest in Lions Park" against enforcement of COVID-19 regulations and walked four laps around

a track. DSF Ex. 12, at 69:18-19. He avers that the mask was not tight enough to form a seal and that he "purposefully had air gaps in it so [he] could breathe." Reale Aff. ¶ 8. When asked whether he exercises, Reale testified, "I try to take walks." DSF Ex. 11, at 50:1.

   **B.  Irizarry**

   The students at the Middle School are in grades 6 through 8. The Middle School is located on Canterbury Road. The Middle School grounds extend out to a portion of public sidewalk that runs the length of the grounds, but no further. The entry point for buses and other vehicles from Canterbury Road is at one side of the grounds, towards the right if one is facing the Middle School. There is a school parking lot past that entry point. The exit for buses and other vehicles is further along Canterbury Road, to the left if one is facing the Middle School. The sidewalk runs the entirety of the space between that entrance and that exit, and continues on beyond the exit. It does not extend beyond the entrance in the other direction. See DSF Ex. 2, at 14 (Ex. C) (map annotated by Sugarman). At 7:00 a.m. on school days, school buses are in the process of dropping off children. "Parents will occasionally stop their vehicles on Canterbury Road and drop their children off at the school entrance rather than enter the school parking lot." DSF ¶ 14.

   The protest in which Irizarry participated began at 7:00

a.m., and it was attended by Irizarry, Stacy Vargas, and a man named Ryan. At 7:00 a.m., buses and parents were in the process of dropping off children and school was scheduled to begin at 7:55 a.m. The area where the protesters had located themselves was on the sidewalk, at the corner of the entrance to the school grounds, in an area commonly used by parents to drop off their children, and children were being dropped off at that time. See DSF Ex. 14 (Irizarry Depo.) (ECF No. 169-2), at 31:13-14 ("Parents were dropping them off and school [buses] were dropping them off."). Ryan had parked his truck on the grass next to the sidewalk. See id. at 33:7 (confirming that Ryan's car was parked in this location). Irizarry and Vargas had parked their cars in the high school parking lot. Ryan's truck was parked in a manner that impeded the flow of traffic and obstructed the buses and cars from entering the school grounds.

Initially two security officers, John Nisbet and Paul Cloke, approached the protestors, but Irizarry was not present for this interaction. Nisbet informed Ryan that he needed to move his truck because it was impeding the flow of traffic. Nisbet also informed Ryan, who was smoking, that smoking was not allowed on school grounds, and Ryan responded by blowing smoke into Nisbet's face. Nisbet and Cloke left to get the Assistant Superintendent, Sugarman.

When Sugarman arrived on the scene, accompanied by Nisbet

and Cloke, Sugarman "asked the owner of the truck to relocate his vehicle to an area that was not impeding traffic and obstructing the [buses] and cars from entering the school grounds." DSF Ex. 2 ¶ 22. Sugarman also "asked the protestors to relocate to a different location that was either across the street or further down the sidewalk." Id. ¶ 23. In addition, he explained that "smoking was prohibited on school grounds and their presence was obstructing parents from dropping off their children for school." Id. "The protestors complied with [Sugarman's] request to relocate and [Sugarman] had no further interaction with them after that." Id. ¶ 24.

Sugarman identified on a map the area where the protesters were located and the two places he suggested as alternative locations. One place was just past the exit from the Middle School grounds used by buses and other vehicles, and was on the sidewalk. The other alternative was on the other side of the entrance to the Middle School property just across from the driveway from where the protesters were located; there was no sidewalk in this area. During her deposition, Irizarry could not recall what alternative location Sugarman suggested to the protesters.

During his deposition Sugarman testified that "there w[ere] three people there that [he] asked politely to move." DSF Ex. 13 (Sugarman Depo.) (ECF No. 169-1), at 38:10–11. Sugarman avers

that he "never prohibited the protestors from protesting," id. ¶ 28, and "never threatened to have any of the protestors arrested or trespassed from the school property," id. ¶ 29. Although a Plainfield police officer visited the Middle School while the protesters were present, the officer was "across the street" and "was patrolling" before "pull[ing] into the school." DSF Ex. 14, at 43:18-20. The officer "did not come out far." Id. at 44:19. The police officer was not called by Sugarman.

In their Local Rule 56(a)(1) Statement of Undisputed Material Facts, the defendants cite to portions of Irizarry's deposition testimony. See DSF Ex. 14. However, the plaintiffs do not cite to any of her testimony, either in their Local Rule 56(a)(2) Statement or in their briefs. Despite the fact that Irizarry is the only plaintiff who was present at the September 1, 2021 protest, and thus has personal knowledge, she has not submitted any affidavit of her own, nor any affidavit of Stacy Vargas or Ryan.

In paragraph 57 of their Local Rule 56(a)(2) Statement, the plaintiffs cite to paragraph 14 of Reale's affidavit in which he refers to a YouTube video and states, "I have also viewed my co-Plaintiff's recorded interaction which involves her First Amendment claims at the following URL . . . ." However, this YouTube video has not been authenticated and is therefore inadmissible. Under Federal Rule of Evidence 901(a), "[t]o

-14-

satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Reale was not present on September 1, 2021, so he is not "a witness with knowledge" of the event, Fed. R. Evid. 901(b)(2), and there is no suggestion in the plaintiffs' papers that there is any other basis on which he could authenticate the video.

The plaintiffs object to certain paragraphs in the defendants' Local Rule 56(a)(1) Statement, stating that they "were denied the reasonable ability to have access to Mr. Nisbet for a deposition, and examination of him requires either a deposition or a trial." Pls.' Local Rule 56(a)(2) Statement in Opp. to Summ. J. (ECF No. 177-2) ("PSF") ¶ 33. See also id. ¶¶ 34-35, 51-57, 59-65 (making the same statement). This does not create a genuine issue with respect to any of the facts set forth in the defendants' Local Rule 56(a)(1) Statement. In addition, the court notes that the defendants made a supplemental disclosure about Nisbet approximately three weeks before the close of discovery, after he had been mentioned in a deposition, and that briefing of discovery disputes continued after that disclosure. Thus Irizarry, who is represented by counsel, had ample time to take steps to depose Nisbet. As the defendants state, "Nisbet's disclosure was made to Plaintiffs while discovery was still open. Plaintiffs knew the security

-15-

guards existed since well before this lawsuit was filed. Despite this knowledge, Plaintiffs never requested any information as to the identities of the school security officers at any point[] during discovery." Defs.' Reply in Supp. of Summ. J. (ECF No. 185) ("Defs.' Reply"), at 8.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce of Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is

well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When

confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex, 477 U.S. at 323)). Immaterial factual disputes will not prevent summary judgment.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in

support of the [nonmovant's] position will be insufficient;
there must be evidence on which [a] jury could reasonably find
for the [nonmovant]." Anderson, 477 U.S. at 252.

Also, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists. See Weinstock, 224 F.3d at 41.
"Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
id., if the movant demonstrates an absence of such issues, a
limited burden of production shifts to the nonmovant, who must
"demonstrate more than some metaphysical doubt as to the
material facts, . . . [and] must come forward with specific
facts showing that there is a genuine issue for trial,"
Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d
Cir. 1993) (emphasis, quotation marks and citations omitted).
"Accordingly, unsupported allegations do not create a material
issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant
fails to meet this burden, summary judgment should be granted.

Because one of the plaintiffs in this case is proceeding
pro se, the court must read the pro se plaintiff's pleadings and
other documents liberally and construe them in a manner most
favorable to the plaintiff. See Burgos v. Hopkins, 14 F.3d 787,
790 (2d Cir. 1994). Moreover, because the process of summary

judgment is "not obvious to a layman," <u>Vital v. Interfaith
Medical Ctr.</u>, 168 F.3d 615, 620 (2d Cir. 1999) (internal
quotation marks and citation omitted), the district court must
ensure that a <u>pro se</u> plaintiff understands the nature,
consequences, and obligations of summary judgment. <u>See id.</u> at
620-21. Thus, the district court may itself notify the <u>pro se</u>
plaintiff as to the nature of summary judgment; the court may
find that the opposing party's memoranda in support of summary
judgment provide adequate notice; or the court may determine,
based on thorough review of the record, that the <u>pro se</u>
plaintiff understands the nature, consequences, and obligations
of summary judgment. <u>See id.</u>

After reviewing the defendant's memorandum in support of
summary judgment and the <u>pro se</u> plaintiff's submissions in
opposition to summary judgment in this case, the court concludes
that the <u>pro se</u> plaintiff understands the nature, consequences
and obligations of summary judgement. First, the defendant
served the notice to <u>pro se</u> litigants required by Local Rule
56(b). Second, the defendant's memorandum states the nature and
consequences of summary judgment. Third, the plaintiffs'
memorandum also states the nature and consequences of summary
judgment. <u>See</u> Pls.' Mem. in Supp. of Obj. to Mot. for Summ. J.
(ECF No. 177-3) ("Pls.' Obj."), at 4-5. The court therefore
finds that the <u>pro se</u> plaintiff in this case understands the

nature, consequences and obligations of summary judgment.

Finally, "the Court may consider only admissible evidence in ruling on summary judgment." Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 301 (D. Conn. 2009).

## III. DISCUSSION

### A.    Count One: ADA Claim by Reale

Reale claims that Haskell, Sugarman, and the Board violated Title II of the ADA[4] when they enforced a facemask requirement against him at a public meeting during the coronavirus pandemic.[5]

"To establish a claim under Title II, a plaintiff must demonstrate '(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.'" Tardif v. City of New York, 991 F.3d 394, 404 (2d Cir. 2021) (quoting Davis v. Shah, 821 F.3d 231, 259 (2d Cir. 2016)). The first element, i.e. that a plaintiff is a qualified individual

---

[4] The Amended Complaint cites to Title III of the ADA, see Am. Compl. ¶¶ 17–19, 22, 26, but is undisputed that his claim is being brought under Title II.

[5] Reale purports to sue defendants Haskell and Sugarman in their individual capacities for a Title II violation. However, "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); see also Walker v. Thibault, No. 23-7896, 2025 WL 294507, at *3 (2d Cir. Jan. 24, 2025) (holding that municipal officials "were entitled to summary judgment on these claims" in their individual capacities under Title II pursuant to Garcia).

with a disability, can be shown by any one of three ways. "The term 'disability' means, with respect to an individual--(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[6] "Major life activities" include but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(2)(A).

Here there has been a complete failure of proof by Reale with respect to each of the three ways a plaintiff can show that he is a qualified individual with a disability. Because Reale cannot establish the first element of this claim, the defendants are entitled to summary judgment on Count One.

### 1.    Substantially Limits a Major Life Activity

Reale has failed to offer evidence that creates a genuine issue as to whether he has "a physical or mental impairment that substantially limits one or more major life activities." Id.

---

[6] Reale contends that the ADA Amendments Act of 2008 ("ADAAA") encompasses his alleged disability and thus presents a "fatal flaw in Defendants' argument." Pls.' Obj., at 9. "Congress, however, retained the term 'substantially limits' in this amendment, while instructing that 'the definition of disability . . . shall be construed in favor of broad coverage . . . , to the maximum extent permitted by the terms of this chapter,' 42 U.S.C. § 12102(4)(A) (emphasis added)."). B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 161 n.10 (2d Cir. 2016).

§ 12102(1)(A).

"[I]n assessing whether a plaintiff has a disability, [we] have been careful to distinguish impairments which merely <u>affect</u> major life activities from those that <u>substantially limit</u> those activities." <u>B.C. v. Mount Vernon Sch. Dist.</u>, 837 F.3d 152, 160 (2d Cir. 2016) (alteration in original) (quoting <u>Ryan v. Grae & Rybicki, P.C.</u>, 135 F.3d 867, 870 (2d Cir. 1998)). "A plaintiff seeking redress under the ADA must 'show that any limitations are in fact substantial, not amounting to only a mere difference in conditions, manner, or duration.'" <u>Id.</u> (quoting <u>Bartlett v. N.Y. State Bd. of Law Exam'rs</u>, 226 F.3d 69, 80 (2d Cir. 1998)).

"Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." <u>Dominguez v. Bd. of Educ. of Yonkers City Sch. Dist.</u>, No. 23 CIV. 2460 (NSR), 2024 WL 3427217, at *4 (S.D.N.Y. July 16, 2024) (internal quotation marks and citations omitted). It is "well-established that an impairment does not significantly restrict a major life activity if it results only in mild limitations." <u>Id.</u> (internal quotation marks and citations omitted).

> [C]ourts in this circuit have held that a substantial limitation on breathing is established when a plaintiff puts forward evidence of episodes requiring

> medical interventions or chronic breathing problems.
> Compare Gorbea v. Verizon N.Y., Inc., No. 11 Civ.
> 3758, 2014 WL 917198, at *8 (S.D.N.Y. Mar. 10, 2014)
> (finding plaintiff's asthma, which was exacerbated by
> high temperatures, chemicals, and dust, did not
> substantially limit her breathing, despite a history
> of asthma, use of an inhaler, and a diagnosis of
> reactive airway dysfunction syndrome and
> bronchospasm); Boughton v. Town of Bethlehem, No. 13
> Civ. 1583, 2015 WL 5306077, at *5–6 (N.D.N.Y. Sept.
> 10, 2015) (finding plaintiff's "uncontrolled
> hypertension," exacerbated by extreme weather, did not
> substantially limit his ability to breathe when it
> resulted in "infrequent breathing problems" of chest
> tightness and breathing difficulties), with Hoeffner
> v. Cnty. of Orange, No. 17 Civ. 9344, 2020 WL 1165851,
> *6 (S.D.N.Y. Mar. 10, 2020) (finding plaintiff who
> suffered nineteen asthma attacks during a three-month
> period caused by her exposure to mold had a disability
> within the meaning of the ADA); Murtha v. N.Y. State
> Gaming Comm'n, 2019 WL 4450687, *10 (S.D.N.Y. Sept.
> 17, 2019) (finding plaintiff adequately pleaded that
> his ability to breathe was substantially impaired when
> he alleged that his asthma, caused by a respiratory
> allergy, resulted in "medical emergencies including
> three hospitalizations over a three-month period").

Norman v. NYU Langone Health Sys., 492 F. Supp. 3d 154, 164

(S.D.N.Y. 2020), aff'd, No. 20-3624-CV (L), 2021 WL 5986999 (2d

Cir. Dec. 17, 2021).

In Shine v. New York City Housing Authority, the plaintiff

"allege[d] that she experiences 'trouble breathing at night.'"

No. 19-CV-04347 (RA), 2020 WL 5604048, at *7 (S.D.N.Y. Sept. 18,

2020). The court concluded that she had failed to plead facts

that established a substantial limitation. The court explained:

> Breathing is one of the enumerated major life
> activities covered under the ADA regulations. 28
> C.F.R. § 35.108(c)(1)(i). As described above, courts
> in this Circuit have established that plaintiffs must

> plead more than vague or conclusory allegations
> regarding "difficulty" or "trouble" conducting a major
> life activity. See [Parada v. Banco Indus. De
> Venezuela, C.A., 753 F.3d 62, 69 (2d Cir. 2014)];
> Farina, 458 F. App'x. at 15; [Nadel v. Shinseki, 57 F.
> Supp. 3d 288, 296 (S.D.N.Y. 2014)]. Shine is thus
> required to plead additional facts beyond simply
> claiming that she has "trouble breathing at night,"
> Compl. ¶ 42, to establish a substantial limitation,
> Farina, 458 F. App'x. at 15; Nadel, 57 F. Supp. 3d at
> 296.

Id. On the other hand, Shine alleged with respect to her minor

son that his "difficulty breathing is severe enough that he

requires use of an asthma machine to 'breathe properly.'" Id.

The court concluded that "[t]his is sufficient to allege that

C.W. experiences a substantial limitation to the major life

activity of breathing, and therefore has a cognizable disability

within the meaning of the ADA." Id.

In Johnson v. Mount Sinai Hospital Group, Inc., the

plaintiff alleged that facemasks "are uncomfortable and hot to

wear," and that "[t]hey make it difficult to breathe," and the

court concluded that she had failed to plausibly allege a

substantial limitation of her breathing. No. 22-CV-2936 (AMD)

(JRC), 2023 WL 2163774, at *4 (E.D.N.Y. Feb. 22, 2023), aff'd,

No. 23-466, 2024 WL 3289475 (2d Cir. July 3, 2024).

"Whether a plaintiff with asthma is substantially limited

in his ability to work or to breathe is a fact specific

question." Murtha, No. 17 CIV. 10040 (NSR), 2019 WL 4450687, at

*10 (S.D.N.Y. Sept. 17, 2019) (citing Burke v. Niagara Mohawk

-25-

Power Corp., 142 Fed. App'x 527, 529 (2d Cir. 2005) (noting that
"asthma does not invariably impair a major life activity")). See
also id. (quoting Hendler v. Intelecom USA, Inc., 963 F. Supp.
200, 207 (E.D.N.Y. 1997) ("Because one plaintiff with asthma is
substantially limited in the major life activity of breathing
does not mean that every plaintiff with asthma has a qualifying
disability under the ADA.")).

Reale has merely offered evidence that he suffers from
sinus and chest congestion, which in February 2018 and in
January 2020 resulted in him seeing a doctor because the
condition had persisted for one or two weeks. He also has
produced evidence that he has associated allergies, which can
result in asthma, and that prior to 2018 he used an over-the-
counter inhaler. While the parties disagree about whether Reale
at any time used an inhaler for which a prescription was
required, that is not a material issue because any such use at
some unspecified time prior to 2019 does not create a genuine
issue as to his condition in September 2021 in light of the more
recent medical records. Reale provides no evidence that either
of his conditions has ever limited his breathing to any
significant degree. The only medical records show that, upon
examination, his respiratory functions were found to be normal--
so much so that for exercise, he tries to take walks. While
Reale gets uncomfortable and feels that it is hard to breathe if

he wears a facemask or face shield, that discomfort was not so great that he was deterred from walking four laps around a track, wearing an N95 mask in or around May 2020.

Thus, Reale has failed to put forth evidence that could show that he has a condition that is severe, or even a condition that has had a permanent or long-term impact on him; nor any evidence that he has had episodes requiring medical intervention or that he has had chronic breathing problems, such as the evidence in <u>Shine</u> with respect to Shine's son. Rather, the evidence offered by Reale shows only that his conditions have resulted in mild limitations, i.e. at most, infrequent breathing problems. Thus Reale's claim is comparable to that of the mother in <u>Shine</u> and the plaintiff in <u>Johnson</u>, as opposed to the claim with respect to Shine's son.

### 2. Record of Such an Impairment

Reale has failed to offer evidence that creates a genuine issue as to whether he has "a record of such an impairment." "[T]he Second Circuit has held that to form the basis for an ADA claim, the 'record of' disability 'must be one that shows an impairment that satisfies the ADA.'" <u>Williams-Moore v. Quick Int'l Courier, LLC</u>, No. 22-CV-3592 (RPK) (RML), 2023 WL 6292540, at *4 (E.D.N.Y. Sept. 26, 2023) (quoting <u>Colwell v. Suffolk Cnty. Police Dep't</u>, 158 F.3d 635, 645 (2d Cir. 1998)). "[A] record reflecting a plaintiff's classification as disabled for

other purposes or under other standards is not enough." Niles v. New York City Hum. Res. Admin., No. 22-CV-6307 (AMD) (JAM), 2024 WL 496346, at *5 (E.D.N.Y. Feb. 8, 2024) (quoting Colwell, 158 F.3d at 645). Reale has offered no records of a physical or mental impairment that substantially limits a major life activity, nor has he presented any other evidence from which a legitimate inference can be drawn that he has a record of such an impairment.

### 3.    Regarded as Having Such an Impairment

Reale has failed to offer evidence that creates a genuine issue as to whether he was ever "regarded as having such an impairment" under 42 U.S.C. § 12102(1)(C). "[T]he plaintiff must show that the [defendant] regarded [him] as . . . having an impairment that substantially limited a major life activity." Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 88 (2d Cir. 2010) (quoting Colwell, 158 F.3d at 646); accord Whitehead v. United Parcel Serv., Inc., 387 F. App'x 16, 18 (2d Cir. 2010) (quoting Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521–22 (1999)). Reale has offered no evidence that any defendant ever regarded him as having a physical or mental impairment of any kind, much less one that substantially limits a major life activity.

### B.    Count Two: First Amendment Claim by Reale

Reale claims that Haskell, Sugarman, and the Board violated

his rights under the First Amendment when they refused to let him speak in-person without a facemask during the September 8, 2021 Board meeting. He argues that "under color of law, custom and usage per 42 U.S.C. § 1983, the facts set forth clearly in the Record demonstrate that Plaintiff Reale's rights to be present in person, to be not challenged as to his right to comment per the Board of Ed's own comment policy and that the Plaintiff be allowed to publicly comment were violated." Pls.' Obj., at 11. The defendants maintain that they did not violate the plaintiff's First Amendment rights by enforcing the state mask mandate in accordance with the Board's facemask policy. The court agrees.[7]

In their memorandum of law, the defendants maintain that the test that is applicable to Reale's First Amendment claim, as opposed to Irizarry's First Amendment claim, is that used in Jacobson v. Massachusetts, 197 U.S. 11 (1905). That proposition has been called into question by the Supreme Court's decision in Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14 (2020). But Jacobson has not been overruled, nor does the per curiam

---

[7] Because the facemask policy did not violate the First Amendment, the court need not undertake a qualified immunity analysis as to defendants Haskell and Sugarman in their individual capacities. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Similarly, the court need not analyze whether the policy was a municipal or state policy for purposes of a Monell claim against the Board, because the policy was constitutional.

opinion <u>Roman Catholic Diocese</u> state what limitations there are
with respect to its applicability. Thus, a number of courts have
concluded that it is unclear whether the traditional First
Amendment analysis should be used for a claim such as Reale's
claim in this count, as opposed to the test in <u>Jacobson</u>.[8]

---

[8] In <u>Jones v. Cuomo</u>, the court explained:

> [I]n a per curiam opinion in <u>Roman Catholic Diocese</u>, the Supreme
> Court temporarily enjoined the enforcement of a New York
> executive order that placed restrictions on in-person religious
> services. 141 S. Ct. at 63. In reaching this determination, the
> Court undertook a traditional constitutional analysis of
> Plaintiffs' First Amendment free exercise claims, and found that
> the executive order was unable to withstand strict scrutiny. <u>Id.</u>
> at 66-68. Any discussion of or reference to the <u>Jacobson</u> standard
> is notably absent from the Court's decision. Instead, in a
> concurring opinion, Justice Gorsuch indicated that the "usual
> constitutional standards should apply during the current
> pandemic." <u>Id.</u> at 71 (Gorsuch, J., concurring). Referring
> specifically to <u>Jacobson</u>, Justice Gorsuch characterized the case
> as a "modest decision" that has been "mistaken . . . for a
> towering authority that overshadows the Constitution[.]" <u>Id.</u>
> Justice Gorsuch emphasized that <u>Jacobson</u> "involved an entirely
> different mode of analysis, an entirely different right, and an
> entirely different kind of restriction." <u>Id.</u> at 70.

> On remand, the Second Circuit determined that the parties'
> and lower courts' reliance on <u>Jacobson</u> "as support for the notion
> that courts should defer to the executive in the face of the
> COVID-19 pandemic" "was misplaced." <u>Agudath Israel of Am.</u>, 983
> F.3d at 635. The Court observed that <u>Jacobson</u> "predated" the
> "tiers of scrutiny," "was decided before the First Amendment was
> incorporated against the states, and 'did not address the free
> exercise of religion.'" <u>Id.</u> (quoting <u>Phillips v. City of New
> York</u>, 775 F.3d 538, 543 (2d Cir. 2015)).

> In the wake of the <u>Roman Catholic Diocese</u> decision, some
> courts' confidence in <u>Jacobson</u> has similarly waned. <u>See, e.g.</u>,
> <u>Amato</u>, 2021 WL 1430918, at *7 & n.11 (applying traditional tiers
> of scrutiny to COVID-19 restrictions); <u>Plaza Motors of Brooklyn
> v. Cuomo</u>, No. 20 Civ. 4851 (WFK) (SJB), 2021 WL 222121, at *4-5
> (E.D.N.Y. Jan. 22, 2021) (declining to apply <u>Jacobson</u> to
> challenge of the same executive order at issue in <u>Roman Catholic
> Diocese</u>). However, other courts in this Circuit have cabined the
> <u>Roman Catholic Diocese</u> decision to First Amendment free exercise
> challenges, and have continued to apply <u>Jacobson</u> to other
> challenges to COVID-19 restrictions. <u>See Hopkins Hawley LLC v.
> Cuomo</u>, No. 20 Civ. 10932 (PAC), 518 F.Supp.3d 705, 712-13,
> (S.D.N.Y. Feb. 9, 2021) ("Although <u>Roman Catholic Diocese</u> and

Consequently, this court has analyzed Reale's First Amendment

claim under both the traditional First Amendment analysis and

under the Jacobson test. Having done so, the court concludes

that the defendants are entitled to summary judgment regardless

of whether the traditional First Amendment analysis is used or

the test in Jacobson is used.

    Accordingly, the defendants' motion for summary judgment is

---

        Agudath Israel raise doubts as to Jacobson's continuing
        viability, Jacobson bears directly on this case and has not been
        explicitly overruled, which means that this Court is bound by
        it."); see also Our Wicked Lady, 2021 WL 915033, at *3; Moxie
        Owl, Inc. v. Cuomo, No. 21 Civ. 194 (MAD) (DJS), 527 F.Supp.3d
        196, 201 n.1 (N.D.N.Y. Mar. 18, 2021). And a number of courts in
        other circuits have taken similar approaches. See, e.g., Big Tyme
        Inv., L.L.C. v. Edwards, 985 F.3d 456, 470-71 (5th Cir. 2021)
        (holding that Jacobson "govern[s] our review of emergency public
        health measures, regardless of the rights at stake."); Stewart v.
        Justice, No. 20 Civ. 611 (RCC), 518 F.Supp.3d 911, 917, (S.D.W.
        Va. Feb. 9, 2021) ("[T]he Court declines to read the tea leaves
        of Roman Catholic Diocese and will follow the [Jacobson] rule
        adopted by a majority of courts."); M. Rae, Inc. v. Wolf, No. 20
        Civ. 2366 (CCC), 509 F.Supp.3d 235, 246, (M.D. Pa. Dec. 23, 2020)
        ("The bottom line for our purposes is that Jacobson is
        controlling precedent until the Supreme Court or Third Circuit
        Court of Appeals tell us otherwise.").

        More recently, a sister court in this District held that
        Jacobson remained applicable on stare decisis grounds, reasoning
        that if a Supreme Court decision "'has direct application in a
        case, yet appears to rest on reasons rejected in some other line
        of decisions, the [lower court] should follow the case which
        directly controls, leaving to [the Supreme] Court the prerogative
        of overruling its own decisions.'" Hopkins Hawley LLC, 2021 WL
        1894277, at *5 n.4 (quoting Rodriguez de Quijas v. Shearson/Am.
        Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526
        (1989)). The Court finds this reasoning persuasive. That said, in
        an abundance of caution, the Court will assess the Executive
        Order and Plaintiff's claims thereto under both Jacobson and the
        traditional tiers of scrutiny.

542 F. Supp. 3d 207, 217-19 (S.D.N.Y. 2021) (footnote omitted) (alterations
in original). See also Amato v. Elicker, 534 F. Supp. 3d 196, 210 n.11 (D.
Conn. 2021) ("However, in view of the uncertainty created by Roman Catholic
Diocese of Brooklyn, this Court applies . . . the traditional tiers of
scrutiny.").

being granted as to Count Two.

### 1. Traditional First Amendment Analysis

The First Amendment standards applicable to the Board
meeting, which took place at a public school, depend on what
type of forum it was. "We analyze speech restrictions on
publicly owned property according to a forum-based approach.
Under this approach, '[f]ora for expression are classified into
four categories, which fall along a spectrum extending from
those deserving the greatest constitutional protection to those
deserving the least constitutional protection: (1) the
traditional public forum; (2) the designated public forum; (3)
the limited public forum; and (4) the non-public forum.'" Tyler
v. City of Kingston, 74 F.4th 57, 61 (2d Cir. 2023) (quoting
R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist., 645 F.3d 533,
539 (2d Cir. 2011)) (citing Cornelius v. NAACP Legal Def. &
Educ. Fund, Inc., 473 U.S. 788, 797, 799–800 (1985)).

The third of these options, "the 'limited' public forum,
exists 'where the government opens a non-public forum but limits
the expressive activity to certain kinds of speakers or to the
discussion of certain subjects.'" Hotel Emps. & Rest. Emps.
Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of
N.Y. Dep't of Parks & Rec., 311 F.3d 534, 545 (2d Cir. 2002)
(quoting N.Y. Magazine v. Met. Transp. Auth., 136 F.3d 123, 128
n.2 (2d Cir. 1998)). "Examples of limited public fora include

. . . open school board meetings . . . ." Id. (citing City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n, 429 U.S. 167, 174–76 (1976)). See also Potanovic v. Town of Stony Point, No. 23-204-cv, 2024 WL 3159221, at *1 (2d Cir. June 25, 2024) ("[T]he public input component of the Town Board meetings is clearly a limited public forum." (citing Tyler, 74 F.4th at 61)); Jones v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 278 (E.D.N.Y. 2013) ("Typically, school board meetings are limited public fora.").

"[I]n limited public fora such as city council meetings, government entities are permitted to restrict the form or manner of speech offered by members of the public, even if such speech addresses the topic or agenda of that forum. Such restrictions on the form of speech are not subject to strict scrutiny; courts need only assess whether the restrictions are reasonable and viewpoint neutral." Tyler, 74 F.4th at 63. "[F]or those who seek to speak on a topic or in a manner not contemplated by the public entity in opening the limited public forum[,] there is no fundamental right of freedom of speech." The Good News Club v. Milford Cent. Sch., 202 F.3d 502, 510 (2d Cir. 2000) (internal quotation marks omitted), rev'd on other grounds sub nom. Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001).

### a.  Reasonableness

"In a limited public forum, the reasonableness analysis

-33-

turns on the particular purpose and characteristics of the forum and the extent to which the restrictions on speech are 'reasonably related' to maintaining the environment the government intended to create in that forum." Tyler, 74 F.4th at 63 (quoting Hotel Emps., 311 F.3d at 554 (internal quotation marks omitted)). "'[T]o survive First Amendment scrutiny[,] the restriction need not be the most reasonable or the only reasonable limitation imaginable,' . . . but simply 'consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated[.]'" Id. (alterations in original) (quoting Byrne v. Rutledge, 623 F.3d 46, 59 (2d Cir. 2010); Hotel Emps., 311 F.3d at 554). "Significantly, the existence of 'alternative channels' of communication is a relevant factor in assessing the reasonableness of a restriction on speech in a limited public forum." Id. (quoting Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 53 (1983)).

There is no genuine issue of material fact as to whether the Board's facemask policy was reasonable because it was consistent with a legitimate interest of the Board.

As to the Board's legitimate interest, the facemask policy begins by incorporating by reference Executive Order 13A. Executive Order 13A is titled Protection of Public Health and Safety During COVID-19 Pandemic – Revised Order for Masks and

Face Coverings, Nursing Home Staff Testing. There is no genuine issue as to the fact that protection of public health and safety during the COVID-19 pandemic is a legitimate governmental interest. In <u>Roman Catholic Diocese of Brooklyn v. Cuomo</u>, the Court stated that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." 592 U.S. at 18. In <u>Stewart v. Justice</u>, the court held that "[s]lowing the spread of a novel virus that has already killed over 250,000 Americans is a compelling, and at least significant, government interest" supporting an executive order "requiring individuals to wear masks indoors." 502 F. Supp. 3d 1057, 1066 (S.D.W. Va. 2020) (citations omitted). Also, in <u>Murray-Nolan v. Rubin</u> the court held that a local school board in New Jersey had "substantial and related underlying governmental interests" in the "continuation of in-person proceedings while preventing of the spread of COVID." No. CV 22-801 (EP) (AME), 2022 WL 4104343, at *9 (D.N.J. Sept. 8, 2022), <u>aff'd sub nom.</u> <u>Falcone v. Dickstein</u>, 92 F.4th 193 (3d Cir. 2024), <u>cert. denied sub nom.</u> <u>Murray-Nolan v. Rubin</u>, 144 S. Ct. 2560 (2024). <u>See also</u> <u>Oakes v. Collier County</u>, 515 F. Supp. 3d 1202, 1216 (M.D. Fla. 2021) (citing <u>Roman Cath. Diocese</u>, 592 U.S. at 18) (evaluating a facemask requirement).

Nor is there any genuine issue as to whether the Board's facemask policy was consistent with the legitimate governmental

interest in protecting public health and safety during the
COVID-19 pandemic. As set forth in Executive Order 13A, the
Governor of Connecticut "issued various executive orders to
protect public health, limit transmission of COVID-19, and
mitigate the effects of the COVID-19 pandemic." DSF Ex. 8, at 2.
The Governor explained that "the COVID-19 pandemic remains a
grave threat to public health and safety and civil preparedness
in the State of Connecticut," id., in part because "according to
the CDC, as a result of increased infection rates and the higher
transmissibility of the Delta variant, all eight of
Connecticut's counties are considered areas of substantial
transmission," id. at 4. The Governor concluded that, because
"breakthrough infection and transmission among vaccinated people
are possible," id., "in certain indoor settings where the risk
of COVID-19 infection is higher because of the concentration of
large numbers of people, the presence of people with underlying
conditions or compromised immune systems, the difficulty of
ascertaining who has been vaccinated may require the universal
wearing of masks and face coverings," id. at 3. In Oakes the
court held that a similar mask requirement "promotes the
[government]'s interest more effectively than no requirement"
and "is not substantially broader than necessary . . . to
prevent the spread of COVID-19 . . . . In other words, it is
narrowly tailored." 515 F. Supp. 3d at 1216.

Underscoring the reasonableness of the Board's facemask policy is the fact that an exemption was provided for people who did not want to wear a facemask because of a medical condition, behavioral condition, or disability, so long as they provided written documentation from an appropriate source that they qualified for the exemption, which documentation did not have to name or describe the condition that qualified the person for the exemption. Further underscoring the reasonableness of the policy is the fact that it provided alternative means for participation in the Board's meetings. See Tyler, 74 F.4th at 63 (quoting Perry, 460 U.S. at 53). Online participants were not required to give any justification for their remote attendance, nor did they have to wear a facemask. This policy was published on the Board's website, and it was attached to each meeting agenda.

Reale argues that the Board's policy was not reasonable because he could have socially distanced himself from other attendees, see Pls.' Obj., at 7, 11, and he states that he took "measurements using a measuring tape" to demonstrate how much space he had, Reale Aff. ¶ 2. But given that a time, place, and manner restriction in a limited public forum does not have to be "the most reasonable or the only reasonable limitation imaginable," Tyler, 74 F.4th at 63 (quoting Byrne, 623 F.3d at 59), Reale's evidence as to what he maintains is a more reasonable restriction does not create a genuine issue of

material fact.

### b.    Viewpoint Neutrality

There is no genuine issue of material fact as to whether the Board's facemask policy was viewpoint neutral. There is no language in the policy that can be read as suggesting viewpoint discrimination. The policy contains a blanket requirement that individuals wear a medical mask unless they provide documentation that they are exempt, and in <u>Falcone</u>, the court held that disobeying a mask requirement is not a constitutionally recognized form of expression:

> Unlike burning a flag, wearing a medical mask--or refusing to do so--is not the type of thing someone typically does as "a form of symbolism." [Spence v. Washington, 418 U.S. 405, 410 (1974)]. The American flag is inherently symbolic. <u>See</u> [<u>Texas v. Johnson</u>, 491 U.S. 397, 405 (1989)]. A medical mask is not. It is a safety device--"protective equipment" used "to protect the wearer from particles or from liquid contaminating the face." <u>N95 Respirators, Surgical Masks, Face Masks, and Barrier Face Coverings</u>, FDA (Mar. 10, 2023), https://perma.cc/E8FM-2M2K. To combat COVID-19, people wear it to curb the spread of an airborne disease. Skeptics are free to--and did--voice their opposition through multiple means, but disobeying a masking requirement is not one of them. One could not, for example, refuse to pay taxes to express the belief that "taxes are theft." Nor could one refuse to wear a motorcycle helmet as a symbolic protest against a state law requiring them. The binary choice envisioned by [the appellant]--either disobeying the Executive Order mandating the wearing of a protective mask or not speaking at all--is a false one. <u>See</u> Appellant Br. 30-31. We thus agree with the District Court that her refusal to wear a mask was not constitutionally protected.

<u>Falcone</u>, 92 F.4th at 207-08, <u>cert. denied sub nom. Murray-Nolan</u>

v. Rubin, 144 S. Ct. 2560 (2024). "Every court to address the
issue has reached the same conclusion." Id. at 208 n.10
(collecting cases).

Reale contends that the Board's facemask policy had a
disparate impact on individuals who, like him, seek to "voice
[his] opinions on public policy in person [against] those
supporting continued mask mandates." Reale Aff. ¶ 17. See also
Pls.' Sur-Reply (ECF No. 194), at 3 (arguing that the net effect
of the defendants' actions was to "suppress public participation
based on the known and anticipated content of public speech").
However, even assuming that a facemask requirement could have a
disparate impact on individuals like Reale,

> viewpoint disparity, standing alone, does not
> constitute proof of viewpoint discrimination. See
> R.A.V. v. City of St. Paul, 505 U.S. 377, 385, 112
> S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("We have long
> held, for example, that nonverbal expressive activity
> can be banned because of the action it entails, but
> not because of the ideas it expresses—so that burning
> a flag in violation of an ordinance against outdoor
> fires could be punishable, whereas burning a flag in
> violation of an ordinance against dishonoring the flag
> is not." (citing cases)); Madsen v. Women's Health
> Ctr., 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d
> 593 (1994) ("[T]he fact that the injunction covered
> people with a particular viewpoint does not itself
> render the injunction content or viewpoint based.")
> . . . .
>
> Where a law is on its face viewpoint neutral
> (e.g., when it applies to conduct that is not
> primarily expressive) but has a differential impact
> among viewpoints, the inquiry into whether the law is
> in fact viewpoint discriminatory turns on the law's
> purpose. Such a law is viewpoint discriminatory only

> if its purpose is to impose a differential adverse
> impact upon a viewpoint. See R.A.V., 505 U.S. at 390,
> 112 S.Ct. 2538 ("Where the government does not target
> conduct on the basis of its expressive content, acts
> are not shielded from regulation merely because they
> express a discriminatory idea or philosophy."
> (emphasis added)); Madsen, 512 U.S. at 762-63, 114
> S.Ct. 2516 (holding that an injunction against anti-
> abortion protesters was not viewpoint discriminatory
> because "none of the restrictions imposed by the court
> were directed at the contents of petitioner's
> message." (emphasis added)); id. at 763, 114 S.Ct.
> 2516 ("We thus look to the government's purpose as the
> threshold consideration." (emphasis added)).

Boy Scouts of Am. v. Wyman, 335 F.3d 80, 93-94 (2d Cir. 2003).

There is no genuine issue as to the fact that the facemask

requirement was not enacted for the purpose of viewpoint

discrimination.

### 2.    **Jacobson v. Massachusetts**

Under Jacobson, courts are required "to uphold governmental

measures to protect public health unless they bear 'no real or

substantial relation to' the object of public health or are

'beyond all question, a plain, palpable invasion of rights

secured by the fundamental law.'" Clementine Co., LLC v. Adams,

74 F.4th 77, 84 (2d Cir. 2023) (quoting Jacobson, 197 U.S. at

27).

The Board's facemask policy satisfies the deferential

standard of review under Jacobson. For the reasons discussed in

Part III.B.1, the Board's facemask policy has, at minimum, a

real or substantial relation to public health. Protecting public

health during the COVID-19 pandemic was a legitimate
governmental interest, and the Board's facemask policy was
consistent with that governmental interest. In addition, for the
reasons also discussed there, the facemask requirement is not a
plain, palpable invasion of rights. The Board's facemask policy
was both reasonable and viewpoint neutral under the traditional
First Amendment test.

Reale argues that this case is distinguishable from
Jacobson because the defendants violated state law, whereas in
Jacobson "the Commonwealth followed the law." Pls.' Obj., at 11.
As discussed below in Part III.B.3, these purported state law
violations do not establish a First Amendment violation.

### 3.   Conn. Gen. Stat. § 1-225; Executive Order 12A

Reale contends that the defendants' actions violated a
Connecticut public meeting law, Connecticut General Statutes
§ 1-225. See Pls.' Obj., at 14 ("That evidence . . . evinces an
overtly manifested intent to not even honor any exemptions . . .
by purposefully excluding and screening those to whom the
exemptions are owed in attending public meetings as contemplated
by General Statutes §1-225."); Pls.' Sur-Reply, at 15 ("[The
defendants] purposefully exclude[ed] and screen[ed] those to
whom the exemptions are owed in attending public meetings as
contemplated by General Statutes §1-225."). It may be that Reale
is merely arguing that the alleged violation of Connecticut

General Statutes § 1-225 is evidence of the defendants' intent. But to the extent he contends that any such violation of the Connecticut statute violated his rights under the First Amendment, that argument is unavailing because the "[m]ere violation of a state statute does not infringe the federal Constitution." Snowden v. Hughes, 321 U.S. 1, 11 (1944). See also Bey v. Wall, No. 18-CV-299, 2018 WL 2860115, at *1 (E.D. Wis. June 8, 2018) ("The alleged misconduct must itself violate the Constitution, regardless of whether it violates state laws or regulations.").

In addition, Reale emphasizes the fact that, in response to interrogatories served by him, Sugarman, Paul Brenton, and Haskell stated that they were enforcing Executive Order 12A at the time of the September 8, 2021 Board meeting. Specifically, with respect to Haskell, Interrogatory Number Five reads, "What specific Executive Orders or other orders were the Defendants enforcing relative to mask wearing as of the September, October and November 2021 Board of Education meetings?" Pl. Reale's Supp. Aff. in Opp. to Summ. J. (ECF No. 194-2) ("Reale Supp. Aff."), at 45 (Attachment 2). The response was, "Executive Order 12A." Id. See also PSF Ex. 2 (ECF No. 177-5), at 25 (the same interrogatory and response with respect to Sugarman); id. Ex. 10 (ECF No. 177-13), at 23 (the same interrogatory and response with respect to Paul Brenton). Based on those interrogatory

responses, Reale argues that his right "to publicly comment w[as] violated," Pls.' Obj., at 11, and "[t]his was within an environment that provided many multiples of the social distancing that the then already *long expired Executive Order 12A* provided for." Id. See also Pls.' Sur-Reply, at 15.

Reale is correct that Executive Order 12A states that "[e]ffective immediately, any person while indoors in a public place who does not maintain a safe social distance of approximately six feet from every other person and who is not fully vaccinated for COVID-19 shall cover their mouth and nose with a mask or cloth face covering." DSF Ex. 5 (ECF No. 167-7), at 4. Reale is also correct that at the time of the Board meeting on September 8, 2021, Executive Order 12A had been repealed. Executive Order 13A, which is dated August 5, 2021, states, "Executive Order No. 12A is repealed." See DSF Ex. 8, at 4.

But Reale's argument does not take into account the provisions of Executive Order 13A and the rule issued by the Commissioner of Public Health. Like Executive Order 12A, Executive Order 13A states that "[a] person while indoors in a public place who does not maintain a safe social distance of approximately six feet from every other person and who is not fully vaccinated for COVID-19 shall cover their mouth and nose with a mask or cloth face covering." Id. But Executive Order 13A

-43-

then goes on to state, "[t]he Commissioner of Public Health shall issue a rule setting forth a comprehensive list of facilities, venues, and other locations where masks and cloth face coverings are required, including for people who are vaccinated, and will amend said rule as the Commissioner determines is warranted by public health conditions." Id. at 5. The Commissioner of Public Health issued such a rule on August 7, 2021, and that rule stated that "[s]ubject to the exemption provided in Executive Order No. 13A, all individuals, regardless of vaccination status, shall wear a face-covering mask at all times when: 1. Inside PreK-12 public or non-public (e.g., "private", "independent", "boarding", etc.) school buildings, excluding residential dormitories, when students are present . . . ." Defs.' Supp. Ex. 18, at 1. Students were present in the auditorium for the entire September 8, 2021 Board meeting. Thus, Reale's contentions based on the responses by Haskell, Sugarman, and Brenton to Interrogatory Number Five fail to create a genuine issue of material fact.

### C.    Count Three: First Amendment Claim by Irizarry

Irizarry claims that Sugarman and the Board violated her First Amendment rights when they asked her to relocate while she was protesting coronavirus-related policies on a public sidewalk that bordered the grounds of the Middle School. The defendants maintain that there is no genuine issue as to the fact that the

burden they imposed was content-neutral, narrowly-tailored, and left Irizarry with an ample alternative channel of communication. The court agrees.[9] Therefore, the defendants' motion for summary judgment is being granted as to Count Three.

The same forum analysis that was applied in Part III.B.1 to Reale's First Amendment claim is applicable here. See Tyler, 74 F.4th at 61 (The four categories of fora are: "(1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum.").

"Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities . . . ." Marcavage v. City of New York, 689 F.3d 98, 104 (2d Cir. 2012) (quoting United States v. Grace, 461 U.S. 171, 179 (1983)) (citing Frisby v. Schultz, 487 U.S. 474, 480 (1988)). "Traditional public fora, such as sidewalks and parks, are afforded the broadest protections for free expression." Kass v. City of New York, 864 F.3d 200, 208 (2d Cir. 2017) (citing Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 341 (2d Cir. 2010) (per curiam); McCullen v. Coakley, 573 U.S. 464, 488 (2014)). Thus, the location where Irizarry was protesting is a traditional public forum, the most protected of these fora.

---

[9] As with Count Two, because the defendants did not violate the First Amendment, the court need not undertake a qualified immunity analysis with respect to defendant Sugarman in his individual capacity. See supra note 7.

"Speech finds its greatest protection in traditional public fora," Marcavage, 689 F.3d at 104 (quoting Make the Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004)), "though even there the right is 'not absolute,'" id. (quoting United for Peace & Justice v. City of New York, 323 F.3d 175, 176 (2d Cir. 2003) (per curiam)). "In [traditional] public fora, the government may apply content-neutral time, place, and manner restrictions only if they are 'narrowly tailored to serve a significant government interest' and if 'ample alternative channels of communication' are available." Kass, 864 F.3d at 208 (quoting Zalaski, 613 F.3d at 341).

There is no genuine issue as to the fact that the restriction applied to Irrizary was content-neutral. The only evidence is that the sole reason Sugarman asked Irizarry and the other two protesters to relocate themselves is that they had located themselves in an area commonly used, and actually being used at that time, by parents to drop off their children at school, and as a consequence were obstructing parents from dropping off their children at school.

"A regulation is narrowly tailored 'so long as [it] . . . promotes a substantial government interest that would be achieved less effectively absent the regulation,' and is 'not substantially broader than necessary to achieve the government's interest.'" Marcavage, 689 F.3d at 106 (internal quotation marks

omitted) (quoting Ward, 491 U.S. at 799-800). "[B]ut 'narrowly tailored' does not mean the 'least restrictive or least intrusive means.'" Id. (quoting Ward, 491 U.S. at 798). "[R]estrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." Id. (quoting Ward, 491 U.S. at 797).

There is no genuine issue as to the fact that Sugarman's request to the protesters to relocate promoted a substantial governmental interest that could not have been achieved otherwise. Irizarry was located where parents were dropping off children at that time. She was in an area commonly used by parents to drop off their children, and it would have been unworkable to change the drop-off zone to accommodate Irizarry. Also, Ryan's truck was parked in a manner that impeded the flow of traffic and obstructed the buses and cars from entering the school grounds. Thus, Sugarman's request that the protesters relocate furthered the government's interest in public safety and in reducing congestion in the area because the protesters were obstructing parents from dropping off their children for school. These are substantial governmental interests. See Madsen, 512 U.S. at 768 ("The [government] also has a strong interest in ensuring the public safety and order, [and] in promoting the free flow of traffic on public streets and

sidewalks . . . ."); Marcavage, 689 F.3d at 104 ("Government 'certainly has a significant interest in keeping its public spaces safe and free of congestion.'" (quoting Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996))). Sugarman's request was narrowly tailored because he merely asked the protesters to move to a different part of the sidewalk on the other side of the exit from the Middle School grounds or, in the alternative, to the other side of the entrance to the Middle School grounds where there was no sidewalk, i.e. from one part of a traditional public forum to another part of it.

"Although an alternative channel for communication must be available, it is clear that '[t]he First Amendment . . . does not guarantee [protesters] access to every or even the best channels or locations for their expression.'" Marcavage, 689 F.3d at 107 (alterations in original) (quoting Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 919 (2d Cir. 1990)). "The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'" Id. (quoting Mastrovincenzo v. City of New York, 435 F.3d 78, 101 (2d Cir. 2006)) (citing Irish Lesbian & Gay Org. v. Giuliani, 918 F. Supp. 732, 744 (S.D.N.Y. 1996) ("Whether ample alternatives are

available does not depend on the preference of the speaker for one method or another.")). "All that is required is that an alternative channel be ample--i.e., an 'adequate' channel for communication." Id. (quoting Deegan, 444 F.3d 135, 144 (2d Cir. 2006)). "In this Circuit, an alternative channel is adequate and therefore ample if it is within 'close proximity' to the intended audience." Id. (quoting United for Peace & Justice, 323 F.3d at 177) (citing Concerned Jewish Youth v. McGuire, 621 F.2d 471, 472-74, 476-77 (2d Cir. 1980)).

Sugarman's request also provided for ample alternative channels of communication. One of the alternative locations he suggested was just on the other side of where buses and other vehicles entered the Middle School grounds from Canterbury Road. The other location he suggested was on a sidewalk, right next to where buses and other vehicles exited the Middle School grounds onto Canterbury Road. Both these alternatives left Irizarry in close proximity to her intended audience, even if neither was her preferred location.

The court notes that there also is no genuine issue as to whether Sugarman's request burdened more speech than necessary because he only asked the protesters to move from one location adjacent to the school grounds to another adjacent location. So even if the fact that Sugarman gave an on-the-spot directive merits a higher level of scrutiny than that in Marcavage, 689

F.3d at 106, that standard is met here. <u>See</u> <u>Case v. City of New</u>
<u>York</u>, 233 F. Supp. 3d 372, 392–93 (S.D.N.Y. 2017) (citing
<u>McTernan v. City of New York</u>, 564 F.3d 636, 655–56 (3d Cir.
2009)). Moreover, Irizarry has never asserted that her speech
was burdened at all.

## IV.   CONCLUSION

For the reasons set forth above, the defendants' Motion for
Summary Judgment (ECF No. 167) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants
and close this case.

It is so ordered.

Dated this 31st day of March 2025, at Hartford,
Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
